## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **SAMI ABOU-HAIDAR** | * | |
| **22 Galerie Saint-Marc** | | |
| **Paris 75002** | * | |
| **France** | | |
| | * | |
| **Petitioner,** | | **Civil No.:** |
| | * | |
| **v.** | | |
| | * | |
| **MARIA EUGENIA SANIN VAZQUEZ** | | |
| **2501 Calvert Street NW, Apt. 701** | * | |
| **Washington, D.C. 20009** | | |
| | * | |
| **Respondent.** | | |
| | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

### VERIFIED PETITION FOR RETURN OF CHILD TO FRANCE
### AND ISSUANCE OF SHOW CAUSE ORDER

**The Convention on the Civil Aspects of International Child Abduction, done at The Hague on October 25, 1980; International Child Abduction Remedies Act, 22 U.S.C. 9001 *et seq*.**

### INTRODUCTION

1.      Petitioner, Sami Abou-Haidar (the "Father"), by and through his undersigned attorneys, files this Verified Petition for Return of Child to France (hereinafter "Petition"), against the Respondent, Maria Eugenia Sanin Vazquez (the "Mother").

2.      The Petition is filed as a result of the Mother's wrongful retention of the parties' daughter, E.A-H.S., born in 2014, in the United States from France.

3.      The Mother has retained the child from the child's proper custody and habitual residence jurisdiction of France. The retention began on or about May 10, 2019.

4.      This Petition is brought pursuant to The Convention on the Civil Aspects of International Child Abduction, done at the Hague on October 25, 1980[1] (hereinafter the "Hague Convention" or "Convention") and the International Child Abduction Remedies Act[2] (hereinafter "ICARA").

5.      The Convention came into effect in the United States of America on July 1, 1988, and was ratified between the United States of America and France on July 1, 1988.[3]

6.      The objects of the Convention are as follows: (1) to secure the immediate return of children wrongfully removed or wrongfully retained in any Contracting State; and (2) to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in other Contracting States. Convention, art. 1.

## JURISDICTION

7.      This Court has jurisdiction under ICARA § 9003(a) & (b) because: (a) the United States district courts have concurrent original jurisdiction (along with the courts of the States) over claims made under the Hague Convention; and (b) the child at issue here is currently physically located within the District of Columbia.

## FACTS

8.      The Father is a citizen of France, Italy, and Lebanon.

9.      The Mother is a citizen of Spain and Uruguay. The Mother's Spanish citizenship entitles her to live and work in France as both countries are members of the European Union.

---

[1]T.I.A.S. No. 11,670 at 1, 22514 U.N.T.S. at 98, *reprinted in* 51 Fed. Reg. 10,493 (1986), text available at: https://www.hcch.net/en/instruments/conventions/specialised-sections/child-abduction (last accessed June 9, 2019).
[2] 22 U.S.C. 9001 *et seq*. (2016).
[3] *See* Hague Abduction Convention Country List, text available at: https://travel.state.gov/content/travel/en/International-Parental-Child-Abduction/abductions/hague-abduction-country-list.html (last accessed June 9, 2019).

10.     The Mother and Father were married on October 19, 2013 in Paris, France.

11.     After the parties' marriage, the parties lived together in Paris, France.

12.     The Father is a private medical doctor in Paris, France.

13.     The Mother is a professor of economics at the University of Évry Val d'Essonne in Paris, France. The Mother's professorship is a lifetime appointment with the University.

14.      The parties' daughter was born in early 2014 in Paris, France.

15.     The Mother and Father are both named as the child's parents on the child's birth certificate.

16.     After the child's birth, the family continued to live together in Paris, France. The family initially lived together in an apartment located at 26 Rue de Plantes in Paris.

17.     The Father continued to work as a private medical doctor in France after the child's birth. The Mother took maternity leave after the child's birth. After the Mother's maternity leave ended she resumed her work as a university professor in France.

18.     The Mother, Father, and child all receive medical and dental care in France through France's comprehensive national healthcare system. They have primary care physicians and dentists in France and have received routine medical and dental care in France. The Mother and Father are both fully involved in the child's health care in France.

19.     The Mother, Father and child are engaged and active members of their local community in France. The parents and child have extended family and many friends in their community in France and participate regularly in community activities in France.

20.     The Mother and Father also have a vacation home in Barcelona, Spain. The family typically spends time together vacationing at their vacation home in Barcelona each year

in March and/or April during the spring months and in June and/or July during the summer months.

21.     The Father also owns another smaller apartment in Paris, located as 22 Galerie Saint-Marc, which he typically rents out to tenants through either long term leases or through Airbnb shorter term rentals.

22.     At the end of the summer of 2015, the family moved out of their original apartment in Paris, France, and into a new larger apartment located at 255 Rue Saint-Jacques in Paris, France.

23.     For the next approximately three years, the family continued their usual family routine of living together in their Paris home, spending time together at their vacation home in Barcelona, and taking other vacations together, typically in August each year.

24.     In approximately March 2018, the Mother was offered a temporary employment position at the International Development Bank (the "IDB") in Washington, D.C. The temporary position is for an eighteen-month contract.

25.     At the time the Mother was offered the temporary position at the IDB, the child was approximately four years old and was enrolled in pre-school in Paris, France.

26.     The parties discussed in detail the potential logistics for the family if the Mother accepted the temporary IDB position, including but not limited to obtaining temporary non-immigrant visas for the family in the United States, temporary pre-schooling arrangements for the child, the Father continuing to maintain his medical practice in France, the Mother requesting approval for a sabbatical from her professorship, and the family's temporary living arrangements in the District of Columbia.

27.     The Mother was excited about the opportunity to advance her career by potentially accepting the temporary IDB position and the Father fully supported the Mother's desire to advance her career through the sabbatical for the temporary IDB position.

28.     The parties agreed that a limited duration, eighteen-month temporary employment position in Washington, D.C. was feasible for their family, particularly given that the child was enrolled in pre-school, but not yet old enough to be enrolled in formal French mandatory elementary education.

29.     The parties therefore agreed that the Mother would accept the eighteen-month temporary employment position in Washington, D.C. and that the family would take a temporary absence together from Paris for the Mother's eighteen-month temporary IDB contract.

30.     The parties agreed that the Mother, Father, and child would return home to live in Paris, France at the conclusion of the Mother's eighteen-month temporary IDB contract.[4]

31.     In furtherance of the parties' agreed eighteen-month temporary sabbatical in Washington, D.C., the Mother sought the necessary approvals from her University in Paris and was granted permission to take a short-term sabbatical from her professorship position. The University approved the Mother's request to take a sabbatical until December 31, 2019.

32.     The parties worked with the IDB to obtain the necessary G4 non-immigrant visas for the family, which allows the family to live in the United States for the duration of the Mother's eighteen-month IDB temporary employment contract. The Mother is the primary G4 non-immigrant visa holder. The Father and child are dependents on the Mother's G4 non-immigrant visa.

---

[4] The Father had of course always agreed with the Mother that if she needed to stay in Washington, D.C. for a modest extension of time beyond the December 31, 2019 end date, a short modest extension would not be a problem if necessary for the Mother to wrap up her work from her temporary employment before the family all returned home together to France.

33.     The parties worked together to locate an appropriate neighborhood in the District of Columbia for their temporary home, and to locate an appropriate multi-lingual pre-school for the child's temporary pre-schooling in the District of Columbia.

34.     The parties agreed on the Woodley Park neighborhood in the District of Columbia, and they rented an apartment, on an initial six-month lease term, at 2501 Calvert Street, N.W., Apt. 605. Upon information and belief, the Mother was listed as the primary lease holder, with the Father and child listed as tenants. The Father did not believe that there was anything unusual about the Mother being listed as the primary leaseholder, particularly because she is the primary G4 visa holder with the Father and child holding G4 dependent visas based on the Mother's primary G4 visa.

35.     The parties enrolled the child in pre-school at the Oyster-Adams Bilingual School, which is located in the same neighborhood as the 2501 Calvert Street, N.W. apartment. Oyster-Adams is a bilingual English-Spanish school with a pre-school program. The parties speak French, Spanish, Italian, and English and have always used all four languages with the child at home. The child understands and speaks all four languages.

36.     The parties also agreed that the Father would maintain his medical practice in France during the family's eighteen-month temporary sabbatical in the United States. In order to maintain his practice, the Father must travel back home to France frequently. The parties agreed that the Father would spend approximately ten consecutive days each month in France to handle appointments with his patients and to maintain his medical practice. The Father would spend the remaining time each month in Washington, D.C. with the Mother and child.

37.     The parties further agreed that they would not keep their rented family apartment in Paris during the eighteen-month temporary sabbatical in the United States because it was

prohibitively expensive to maintain the rented family apartment in Paris, the vacation home in Barcelona, the apartment owned by the Father in Paris, and the temporary apartment in Washington, D.C.

38.     The Mother and Father therefore agreed that during the Father's ten days in Paris each month, he would stay in the apartment he owns at 22 Gallerie Saint-Marc.  During the time the Father is not at home in Paris at the apartment, the parties agreed that the apartment at 22 Gallerie Saint-Marc would be rented out through Airbnb, which would assist in offsetting the expenses of the Father travelling back and forth between Paris and Washington, D.C. each month.

39.     The Mother and Father also made arrangements to store the majority of the family's personal belongings in a storage garage in Paris, France during the eighteen-month temporary sabbatical in Washington, D.C. The family did not ship their large personal items, such as furniture and decorative items, to Washington, D.C. The family only brought with them to Washington, D.C. essential day-to-day personal items, such as clothing and small personal electronics.

40.     After all of the logistical arrangements for the eighteen-month temporary sabbatical in Washington, D.C. had been agreed between the parties and organized, the family travelled from Paris to Washington, D.C. in July 2018 to begin their eighteen-month temporary sabbatical.

41.     The family initially proceeded as agreed with the eighteen-month temporary sabbatical in Washington, D.C.

42.     The Mother began her temporary employment with the IDB. The child attended the bilingual pre-school program. And the Father travelled back and forth between home in France maintaining his medical practice, and spending time with the family in Washington, D.C.

43.     In mid-March, 2019, the family changed apartments into a different apartment unit in the same apartment building at 2501 Calvert Street, N.W. The Mother, as the primary leaseholder for the parties' original unit in the building, took charge of organizing the change of units. The Father later learned that the Mother had not listed the Father as a tenant at the new apartment unit in the building. The Father did not know this fact at the time the Mother signed the lease for the new apartment unit. The Mother signed a one-year lease for the new apartment unit. At the time, the Mother explained to the Father this was because the one-year lease was the only lease term available for the unit at an affordable monthly rate.

44.     During the temporary sabbatical in Washington, D.C., the Mother and child also travelled back home to Paris to visit friends and family.

45.     The Mother and Father planned for the family to be home in Paris for the Easter holiday in April 2019. The parties' plan was for the family to spend approximately ten days at home in Paris for the Easter holiday.

46.     The Mother and child were scheduled to travel from Washington D.C. to Paris on April 12, 2019. The family had booked airline tickets for the Mother and child to do so. The plan was for the family to then spend approximately ten days together in Europe and then travel to Washington, D.C. together.

47.     The Father scheduled his working time in Paris for approximately ten days prior to the scheduled arrival of the Mother and child in Paris. He also scheduled various work appointments throughout the additional time the family was scheduled to be in France.

48.     The Father went home to Paris before the Mother and child as scheduled for his work.

49.     At the last minute, the Mother told the Father that she and the child would not be coming home to Paris for the Easter holiday as planned. The Father was surprised by the Mother's last minute change of plan, but at the time he did not read anything into the sudden change of plan other than that the Mother simply did not want to travel or did not want to leave her work for an extended period of time.

50.     The Father, with the encouragement of the Mother, stayed in France for the duration of the originally planned Easter trip, while the Mother and child remained in Washington, D.C. The Father stayed in France because he had previously scheduled appointments through his medical practice. The Father had also previously scheduled a short trip to Lebanon after the vacation period to visit his elderly grandmother before travelling back to Washington, D.C.

51.     Upon information and belief, the Mother spent the time that she was originally scheduled to be in Paris with the child meeting with attorneys in the United States and preparing to file a child custody case against the Father in the Superior Court of the District of Columbia.

52.     The Father returned to the family's temporary apartment in Washington, D.C. on April 29, 2019.

53.     When the Father returned, the family spent the week and weekend together in Washington, D.C. They spent time together as a family, went for walks and to the park, and had meals with friends.

54.     On Monday, May 6, 2019, the Mother told the Father that her mother and her mother's husband (the "Maternal Grandparents") would be arriving that day from Uruguay to

visit. The Maternal Grandparents live in Uruguay. The Maternal Grandparents would be staying with the family at their apartment in Woodley Park. The Father asked the Mother how long the Maternal Grandparents would be staying for the visit. The Mother did not provide the Father with a clear answer.

55.    The Maternal Grandparents arrived later that day. The family spent the evening together having dinner at the parties' apartment and watching television.

56.    The next morning (Tuesday, May 7, 2019), the Mother told the Father that the Maternal Grandparents wanted to take the child to pre-school. The Father agreed for them to do so because the pre-school is walking distance from the family's apartment.

57.    As soon as the Maternal Grandparents and child had left the apartment, the Mother announced to the Father that she wanted to separate from him and wanted to end their relationship. The Father attempted to discuss the issue with the Mother. After just a few minutes of discussion, there was a knock at the door of the apartment. The Mother answered the door and then summoned the Father to the door. When the Father approached the door, a process server served the Father with a Complaint for Custody, Child Support, and Other Relief (the "Complaint") that the Mother had filed in the Superior Court for the District of Columbia (the "Superior Court") on May 2, 2019.

58.    In the Mother's Complaint, she avers that she " . . . is and has been a *bona fide* resident of the District of Columbia for more than six months immediately preceding the filing of [the] Complaint." She further avers that the Father is a "permanent resident of Paris, France." She avers that the child is a resident of the District of Columbia and "moved here" on July 1, 2018. The Mother fails to reveal anywhere in her Complaint that the child's residence in the

District of Columbia is temporary, or related in any way to the Mother's sabbatical, or that the child is returning to France at the end of the Mother's sabbatical.

59.     After the Father was served with the Complaint, the parties continued to discuss the issue for approximately forty-five more minutes before the Mother stated that she needed to go to work. The Father asked the Mother to discuss the matter with him again that evening.

60.     That same evening, the Mother, Father, child, and Maternal Grandparents were all at the apartment in Woodley Park. The Father suggested that the Maternal Grandparents look after the child while the Mother and Father go to a nearby restaurant to discuss the events of that morning.

61.     The Mother and Maternal Grandparents refused. The Mother then told the Father that he could no longer stay at the apartment and that he was not listed as a tenant on the lease. The Mother "allowed" the Father to stay at the apartment that night because it was already very late in the evening.

62.     The Father left the apartment the next morning (Wednesday, May 8, 2019). The Father checked into a hotel and began researching how to move forward with respect to the Mother's Complaint filed in the Superior Court.

63.     The Father again reached out to the Mother in an effort to discuss this new family situation. The Mother agreed to meet with the Father on the evening of Friday, May 10, 2019 to discuss the matter at a park near the Woodley Park Metro Station.

64.     During the parties' discussion, the Father specifically asked the Mother about her plans at the conclusion of the sabbatical, now that she had filed for custody of the child in the Superior Court and based on the averments contained in the Mother's Complaint.

65.     The Mother, during the conversation on May 10, 2019, told the Father that the child is not returning to France at the end of the eighteen-month sabbatical on December 31, 2019 and that the Mother had made the unilateral decision to remain with the child in the United States—thereby repudiating the parties' shared agreement for the child to return to France at the conclusion of the temporary sabbatical in the United States.

66.     During this conversation on May 10, 2019, the Father learned for the first time the true nature of the Mother's situation in Washington, D.C. – namely, that the Mother has unilaterally decided that the child is not returning to France and that the Mother has repudiated the parties' agreement for the child to return to France at the conclusion of the temporary sabbatical in the United States.

67.     In response to the Mother's statements in the conversation on May 10, 2019, the Father told the Mother that he does not agree, and never has agreed, for the child to stay in the United States beyond the originally agreed-upon temporary sabbatical period. He told the Mother that he has never agreed for the child to live permanently or indefinitely anywhere outside of France. The Father made clear to the Mother that based on the Mother's repudiation of the parties' agreement for the child to return home to France, the Father no longer agrees for the child to be in the United States, even temporarily.

68.     That same day, the Father told the Mother that he had retained counsel to represent him in dealing with the Mother's unilateral decision to stay in the United States beyond the agreed upon sabbatical and in responding to the Mother's Superior Court filing.

69.     In response, the Mother demanded that the Father return to her his keys to the temporary Woodley Park apartment.

70.     The Father had also previously learned from the Mother that the Mother had locked the child's passports (the child has French and Spanish passports) in a safe deposit box at the IDB. The Mother told the Father that the safe deposit box is in her name only and that the Father does not have access to the safe deposit box. The Father had repeatedly requested that the Mother return the child's passports to the family's temporary apartment in Washington, D.C. After meeting with the Mother on May 10, 2019, the Father understood why the Mother had hidden the child's passports— because she had repudiated the parties' agreement for the child to return home to France at the conclusion of her sabbatical.

71.     The Mother has now also restricted the Father's access time with the child. Between the date of being served with the Mother's Complaint and the date of filing this petition, the Father has continued to travel between Paris (to maintain his medical practice at home) and Washington, D.C. to manage this new family situation and litigation initiated by the Mother. The Father stays in Airbnb rentals when he is in Washington, D.C.

72.     The Father has also now learned that the Mother has unilaterally re-enrolled the child for another full year of school at the Oyster-Adams Bilingual School.

73.     On May 23, 2019 – before the deadline for filing his responsive pleading – the Father filed an initial Answer and Counterclaim in the Superior Court, responding to the Mother's Complaint.

74.     On June 6, 2019, the Father submitted his Hague Convention Return Application ("Hague Application") to the French Central Authority, seeking the return of the child to France.

75.     Also on June 6, 2019 – still before the deadline for filing his responsive pleading in the Superior Court – the Father withdrew his Answer and Counterclaim. The Mother had not filed any response to the Father's Counterclaim. On the same day, the Father replaced his now

withdrawn initial responsive pleadings with an Emergency Notice of Wrongful Retention Claim and Notice to Stay, thereby advising the Superior Court that the Father had submitted his Hague Application to the French Central Authority.

76.     The Father then promptly retained counsel to file this Petition in this Court seeking the return of the child to France.

### COUNT I – WRONGFUL RETENTION

77.     The Father restates and re-alleges the allegations contained in Paragraphs 1 through 76 as if fully set forth herein.

78.     The Hague Convention applies to cases in which a child under the age of sixteen (16) years has been removed or retained from his or her habitual residence in breach of rights of custody of a petitioner, which the petitioner had been exercising at the time of the wrongful removal or wrongful retention of the children.

79.     The child here is under the age of 16.

80.     The retention of the child in the United States from France began on or about May 10, 2019 – the date the Mother told the Father that the child is not returning to France at the end of the eighteen-month sabbatical on December 31, 2019 and that the Mother had made the unilateral decision to remain with the child in the United States, thereby repudiating the parties' agreement for the child to return to France at the conclusion of the temporary sabbatical in the United States.

81.     During this conversation on May 10, 2019, the Father learned for the first time, the true nature of the family's situation in Washington, D.C. – namely, that the Mother has unilaterally decided that the child is not returning to France and that the Mother has repudiated

the parties' agreement for the child to return to France at the conclusion of the temporary sabbatical in the United States.[5]

82.     In response to the Mother's statements in the conversation on May 10, 2019, the Father told the Mother that he does not agree, and never has agreed, for the child to stay in the United States beyond the originally agreed-upon temporary sabbatical period. He told the Mother that he has never agreed for the child to live permanently or indefinitely anywhere outside of France.

83.     The habitual residence of the child is France and was France on the date the Mother retained the child in the United States.

84.     The child has lived in France since her birth in early 2014.

85.     The parties have only ever had a shared, settled intent for the child to reside in France. They have never had a shared intent for the child to live anywhere other than France. The parties agreed for the child to have a temporary sabbatical in the United States for a period of

---

[5] *See Palencia v. Perez*, 921 F.3d 1333, 1342 (11th Cir. 2019) (holding that the date of wrongful retention is the date on which the retaining parent informs the other parent that she will not be returning the child and the petitioning parent learns "the true nature of the situation."); *see also Marks on behalf of SM v. Hochuser*, 876 F.3d 416, 417 (2d Cir. 2017) (holding that the wrongful retention occurred when the custodial parent told the non-custodial parent that she would be staying in the United States with the child and not returning to the country of habitual residence); *Darin v. Olivero-Hoffman*, 746 F.3d 1, 10-11 (1st Cir. 2014) (holding the same as *Marks on behalf of SM*); *Blackledge v. Blackledge*, 866 F.3d 169, 179 (3d Cir. 2017) (holding that the retention date is the date beyond which the petitioning parent consents to the child being away from the habitual residence, which is clearly communicated); *But see Toren v. Toren*, 191 F.3d 23, 27 (1st Cir. 1999) (holding that "anticipatory retention" based on a retaining parent's "intention" not to return to child's habitual residence does not state a claim for wrongful retention under the Convention where the only allegation in the Petition for Return relates to the respondent parent's "intention."); *see also In the matter of C (Children)* [2018] UKSC 8 (the Supreme Court of the United Kingdom holding that a "repudiatory retention" is possible under the law and noting that United States courts have found both ways on whether "anticipatory retention" is sufficient to state a claim for retention) (available at: https://www.supremecourt.uk/cases/docs/uksc-2017-0135-judgment.pdf) (last accessed June 9, 2019).

eighteen months, at the end of which the child would return to France. The parties never agreed for the child to live outside France indefinitely or permanently.

86.     The child's presence in France has a degree of settled purpose from the child's perspective. Before taking the temporary sabbatical trip to the United States, the child was fully involved in French family life, community life, and pre-school life. The child attended play groups, play dates, and birthday parties with in France. The child has extended family and friends in France. The child has lived her entire life, except for the temporary sabbatical trip, in France.

87.     The Mother and Father are both fully involved in the child's pre-school life, community life, and family and social life in France. Both parents participate in decision making with respect to the child's life in France.

88.     At the time of the Mother's retention of the child in the United States from France on or about May 10, 2019, the Father had—and continues to have—rights of custody to the child under French law.

89.     The French Civil Code governs rights of custody under French law.

90.     Article 371-1 of the French Civil Code provides that both parents have joint rights of custody to a child, namely, joint parental authority, by operation of law. Joint parental authority under French law requires that the parents make joint decisions with respect to, *inter alia*, the child's health, education, religion, and relocation.

91.     Article 373-2 of the French Civil Code provides that the breakdown of a marriage of other relationship between a child's parents has no impact on the parents' joint parental authority rights to the child. Separated parents continue to hold joint parental authority over a child, which may only be changed by court order.

92.     There are no court orders entered  by any court anywhere in the world relating the child in this case.

93.     The rights and responsibilities of a person with joint parental authority under French law necessarily involve the "care of the child" and are therefore  rights of custody under Article 5*a* of the Hague Convention.

94.     Joint parental authority rights are "rights of custody" under Article 5*a* of the Hague Convention.

95.     The Father here, as a holder of joint parental authority, did not ever consent for the Mother to retain the child in the United States.

96.     The Mother's retention of the child in the United States is in breach of the Father's rights of custody under French law and is therefore wrongful.

97.     Notice is given in this pleading that the Father is relying upon foreign law. Fed.R.Civ.P. 44.1.

98.     At the time of the Mother's retention of the child in the United States from France, the Father was actually exercising his custody rights within the meaning of Articles 3 and 5*a* of the Convention, in that he is the father of the child and he has actively participated in the child's life since the child's birth.

99.     The Father has never consented or acquiesced to the retention of the child in the United States from France.

100.    The Father has promptly taken all legal steps available to him to seek the return of the child to France.

101.    The child is currently physically located within the District of Columbia with the Mother at 2501 Calvert Street, N.W., Apt. 701, Washington, D.C. 20009.

## COUNT II – ARTICLE 18 RETURN

102.    The Father restates and re-alleges the allegations contained in Paragraphs 1 through 101 as if fully set forth herein.

103.    The Father invokes Article 18 of the Convention, which grants this Court plenary power to order the child's return at any time.[6]

104.    In accordance with the Article 18 equitable return factors set forth in Justice Alito's concurring opinion in *Lozano v. Montoya Alvarez*, the Father requests that this Court exercise its equitable discretion to return the child to France under Article 18 even if the Mother establishes one of the Convention's five narrow discretionary exceptions to return under the Convention.[7]

105.    The child here has an interest in returning to France, her country of habitual residence.

106.    The child has close ties with France; in particular, she has close ties to her Father, extended family members, and friends in France.

107.    The child has a strong need for regular contact with the Father, who was exercising rights of custody at the time of the retention in the United States. The Mother is now preventing substantial contact between the child and the Father.

108.    The Father has an interest in exercising his French rights of custody in France, which he was doing in France before the start of the temporary sabbatical in the United States,

---

[6] *See* Convention, art. 18; *see also* 51 Fed. Reg. 10,494, 10,509 (1988) (legal analysis of the Hague Convention by the U.S. Department of State); *Lozano v. Alvarez*, 134 S.Ct. 1224, 1237 (2014) (Alito, J., concurring); *In re B. Del C. S. B.*, 559 F.3d 999, 1015-16 (9th Cir. 2009); *Alcala v. Hernandez*, 826 F. 3d 161 (4th Cir. 2016).

[7] *See Lozano*, 134 S.Ct. at 1237 (Alito, J., concurring) (listing factors that weigh in favor of returning a child to the country of habitual residence even when a narrow discretionary exception to return is established).

which he was doing in the United States during the temporary sabbatical, and which both parties had intended for him to do in France at the end of the temporary sabbatical upon the family's return home to France.

109.    The Governments of France and the United States both have an interest in discouraging inequitable conduct and deterring international child retentions.

## PROVISIONAL AND EMERGENCY REMEDIES[8]

110.    The Father requests that the Court issue a Show Cause Order forthwith ordering the appearance of the Mother and child before this Court on the first available date on the Court's calendar, and directing the United States Marshal to serve the Show Cause Order on the Mother forthwith.

111.    Pursuant to ICARA § 9004, in a proceeding for the return of a child, "[n]o court exercising jurisdiction … may … order a child removed from a person having physical control of the child unless the applicable requirements of State law are satisfied."  ICARA § 9004.  In this case, the law referred to is that of the District of Columbia.

112.    In the District of Columbia, the Uniform Child Custody Jurisdiction and Enforcement Act ("UCCJEA") is the source for statutory law governing, *inter alia*, the resolution of both domestic and international child custody disputes and is codified as the D.C. Code Ann. § 16-4601.01 *et seq*.  District of Columbia law addresses the appearance of the parties and the child in such cases in § 16-4601.10.  That section authorizes this Court to order the appearance of the child and custodian or custodians.  *Id.*  This Court therefore has the authority

---

[8]   This Court "[i]n furtherance of the objectives of . . . the Convention . . . may take or cause to be taken measures under Federal or State law, as appropriate, to protect the well-being of the child involved or to prevent the further removal or concealment before the final disposition of the petition."  ICARA § 9004.

to issue a show cause order, ordering the appearance of the Mother in that the provisions of 22 U.S.C. § 9004 can be met.

113.    The Father further requests that this Court order, as a part of the Show Cause Order, a provision prohibiting either party from the removal of the child from the jurisdiction of this Court during the pendency of the proceedings in this Court, taking into possession all of the child's travel documents, and thereafter entering a Scheduling Order setting an expedited hearing on the Verified Petition for Return of Child to France.

## UCCJEA DECLARATION

114.    The details regarding the minor child that are required to be provided under the UCCJEA are as follows:

A.    From on or about May 8, 2019 through present, the child has been physically located at 2501 Calvert Street, N.W., Apt. 701, Washington, D.C. 20009 with the Mother;

B.    From on or about March 15, 2019 until May 7, 2019, the child temporarily lived at 2501 Calvert Street N.W., Apt. 701, Washington, D.C. 20009 with the Mother and Father as a part of the family's agreed upon eighteen-month sabbatical from France;

C.    From on or about July 1, 2018 until March 14, 2019, the child temporarily lived at 2501 Calvert Street N.W., Apt. 605, Washington, D.C. 20009 with the Mother and Father as a part of the family's agreed upon eighteen-month sabbatical from France;

D. From on or about February 16, 2015 until on or about July 1, 2018, the child lived at 255 Rue Saint-Jacques, 75005, Paris, France with the Mother and Father;

E. From the child's birth in early 2014 until on or about February 16, 2015, the child lived at 26 Rue de Plantes, 75014, Paris, France with the Mother and Father;

F. Each year, from the child's birth in early 2014 until the summer of 2017, the child spent a portion of the spring and/or summer months at the family's vacation home located at Carrer Boc Boronat #02, 80005, Barcelona, Spain with the Mother and Father;

G. The Father does not have information of any custody proceeding concerning the child pending in any other court of this or any other State, except as set forth in this Petition.

H. The Father does not know of any person, or institution, not a party to the proceedings, which has physical custody of the child or claims to have rights of parental responsibility or legal custody or physical custody of, or visitation or parenting time with the child.

## NOTICE OF HEARING

115. Pursuant to ICARA § 9003(c), the Mother will be given notice of any hearings in accordance with the District of Columbia's UCCJEA.[9]

---

[9] The Convention itself does not specify any specific notice requirements. ICARA provides that notice be given in accordance with the applicable law governing notice in interstate child custody proceedings. ICARA § 9003(c).

**ATTORNEYS' FEES AND COSTS INCLUDING TRANSPORTATION EXPENSES
PURSUANT TO CONVENTION ARTICLE 26 AND ICARA § 9007**

116.    The Father has incurred substantial expenses as a result of the wrongful retention of the child by the Mother. The Father will submit a copy of all expenditures as soon as practicable and possible and will amend these costs, from time to time, according to proof and in light of further expenditure required because of the Mother's wrongful retention.

117.    The Father respectfully requests that this Court award all reasonable and necessary expenses and reduced fee attorneys' fees and costs incurred to date as required by ICARA § 9007, reserving jurisdiction over further expenses.

**RELIEF REQUESTED**

**WHEREFORE**, Petitioner, Sami Abou-Haidar, respectfully requests the following relief:

A.    That this Court issue an Order directing the prompt return of the child to her habitual residence of France in accordance with Petitioner's rights of custody under French law and Articles 3, 5*a* and 18 of the Convention;

B.    That this Court issue a Show Cause Order forthwith, scheduling an initial show cause and scheduling hearing on the first available date on the Court's calendar;

C.    That this Court's Show Cause Order also include a provision ordering that neither party may remove the child from this Court's jurisdiction during the pendency of these proceedings, and taking into the Court's possession all of the child's passports and any other travel documents;

D.    That this Court's Show Cause Order be served on the Respondent by the United States Marshal Service;

E.      That this Court order electronic and in-person access for the Petitioner with the child during the pendency of these proceedings;

F.      That if the Respondent fails to appear pursuant to this Court's Show Cause Order, that this Court issue an Order directing that the name of the child be entered into the national police computer system (N.C.I.C.) missing persons section and that an arrest warrant be issued for the Respondent;

G.      That this Court issue an Order directing the Respondent to pay the Petitioner's reasonable and necessary expenses, including but not limited to attorneys' fees, suit money, expenses, and costs; and

H.      That this Court grant any such further relief as justice and the Petitioner's cause may require.

## VERIFICATION

PURSUANT TO 28 U.S.C.A. §1746, I DECLARE UNDER THE PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.  EXECUTED ON JUNE 10, 2019.

_____
Sami Abou-Haidar
*Petitioner*

/s/ Kelly A. Powers_____
Stephen J. Cullen, D.C. Bar No. 439872
Kelly A. Powers, D.C. Bar No. 1007106
Leah M. Hauser, D.C. Bar No. 1031995
Miles & Stockbridge P.C.
1201 Pennsylvania Avenue NW, Suite 900
Washington, D.C. 20004
(202) 465-8374
(410) 385-3709 (fax)
scullen@milesstockbridge.com
kpowers@milesstockbridge.com
lhauser@milesstockbridge.com

*Attorneys for Petitioner*