# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

---

|  |  |  |
|---|---|---|
| **SAMI ABOU-HAIDAR,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:19-cv-01687** |
| | ) | |
| **MARIA EUGENIA SANIN VAZQUEZ,** | ) | |
| | ) | |
| **Respondent.** | ) | |

---

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

## I.    INTRODUCTION

Petitioner Sami Abou-Haidar resides in Paris, France.  His wife, Respondent Maria Eugenia Sanin Vasquez, lives in Washington, D.C.  The couple's daughter, E.A.-H.S., age four, presently lives with her mother in Washington, D.C.  Petitioner filed this action on June 10, 2019, seeking return of E.A.-H.S. to France, pursuant to the 1980 Hague Convention on the Civil Aspects of International Child Abduction.

The court held a two-day evidentiary hearing on the Petition on August 1 and 2, 2019. The principal contested issues were: (1) whether Respondent had "wrongfully retained" E.A.-H.S., and (2) if she had, whether the United States or France was the child's "habitual residence" on the date of wrongful retention.  On August 21, 2019, in an abbreviated order, the court ruled in favor of Petitioner.  *See* Order, ECF No. 38.  The court found that Respondent had wrongfully retained the couple's daughter as of May 7, 2019, when she served upon Petitioner a Complaint for Custody filed in the D.C. Superior Court.  The court also concluded that, as of that date, E.A.-H.S.'s place

of "habitual residence" was France, and not the United States. *See id.* at 3–4. The court therefore ordered the child's return to France.[1]

This Memorandum Opinion provides a more fulsome explanation of the court's reasons for granting the Petition.

## II.     THE CONVENTION

The 1980 Hague Convention on the Civil Aspects of International Child Abduction ("Convention"), T.I.A.S. No. 11670, S. Treaty Doc. No. 99-11, is a multilateral treaty designed to address "the problem of international child abductions during domestic disputes," *Abbott v. Abbott*, 560 U.S. 1, 8 (2010). The Convention seeks "to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States" and creates protocols "to secure the prompt return of children wrongfully removed to or retained in any Contracting State." *Id.* at 8 (quoting Convention, art. 1 (internal quotation marks and citation omitted)). The United States ratified the Convention in 1988, *see Lozano v. Montoya Alvarez*, 572 U.S. 1, 6 (2014), and implemented it the same year through the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. § 11601 et seq.

A federal court's inquiry under the Convention is limited. "The Convention and [ICARA] empower courts in the United States to determine only rights under the Convention and *not* the merits of any underlying child custody claims." 42 U.S.C. § 11601(b)(4) (emphasis added). Likewise, the Convention provides that "[a] decision under this Convention concerning the return of the child shall not be taken to be a determination on the merits of any custody issue."

---

[1] The court left it to the parties to negotiate a date on which to return E.A.-H.S., such return to be "no sooner than the expiration of Respondent's first 18-month contract with the International Development Bank." Order at 1. The parties, however, were not able to reach an agreement. *See* Jt. Status Report on Arrangements for Return to France, ECF No. 38. The court has not yet set a firm return date, because it understands that Respondent's contract will not expire until the end of the calendar year. The court intends to enter a return date now that it has issued this Memorandum Opinion.

Convention art. 19. Thus, "[t]he basic purpose and function of the Hague Convention and ICARA are to ensure the home country should make the custody determination." *In re S.E.O.*, 873 F. Supp. 2d 536, 541 n.4 (S.D.N.Y. 2012) (quoting *Navani v. Shahani,* 496 F.3d 1121, 1129 (10th Cir. 2007) (internal quotation marks omitted), *aff'd in part, vacated in part, remanded sub nom. Ozaltin v. Ozaltin*, 708 F.3d 355 (2d Cir. 2013); *see also Abbott*, 560 U.S. at 9 (noting that the Convention does not "alter the pre-abduction allocation of custody rights but leaves custodial decisions to the courts of the country of habitual residence").

## III.    FINDINGS OF FACT

Having considered and weighed the testimony and evidence presented by the parties, the court makes the following findings of fact.

### *Family History*

1.      Petitioner and Respondent were married in Paris, France, in October 2013. Trial Tr. at 29.[2] Their daughter, E.A.-H.S., was born in 2014 in Paris, France. *Id.* at 30.

2.      Petitioner is a medical doctor who provides house-call services, through a French company called SOS Médecins. *Id.* at 28, 30. He is licensed to practice medicine only in France. *Id.* at 28. Respondent is a Ph.D-level economist. Pet'r Ex. 7. Since 2013, she has worked primarily as an associate professor at the Université d' Evry Va' d' Essonne, located just outside of Paris. *See id.*

3.      Since the birth of their daughter, the parties have lived primarily in Paris, with intermittent periods of stay in Barcelona, Spain. Pet'r Exs. 9 at 2, 10 at 3. Until June 30, 2018, the family resided in a rented apartment, located at 255 Rue Saint-Jacques, in Paris. Trial Tr. at

---

[2] Trial transcripts are docketed at ECF Nos. 36 and 37. Because the transcript is paginated consecutively, the court simply cites to the "Trial Tr." without specifying the date of testimony.

53; Pet'r Ex. 13. E.A.-H.S. attended preschool nearby. Trial Tr. at 116–17. The parties had an active social life in Paris, often entertaining friends at their home. *Id.* at 140–41.

4. The parties own an apartment in Barcelona, Spain, in which they have stayed for extended periods of time, sometimes for several months out of the year, typically during the spring and summer months. Pet'r Exs. 9 at 2, 10 at 3.[3] For instance, from 2015 to 2017, Respondent worked as a visiting professor (or in a similar capacity) at universities in Barcelona. *See* Trial Tr. at 164–65. During these periods, Petitioner would travel back and forth to Paris for work. *Id.* at 165, 167–68. E.A.-H.S. would attend school when in Barcelona. *Id.* at 167.

5. According to Petitioner, E.A.-H.S. had more school friends and was involved in more activities in Paris, than in Barcelona. *See id.* at 116–17. The court credits this testimony as Respondent did not dispute it. *See id.* at 167 (testifying that E.A.-H.S. had friends in Barcelona, but not disputing Petitioner's characterization of their daughter's relative friendships and activities as between Paris and Barcelona).

### *Opportunity with the International Development Bank*

6. In January 2018, Respondent was offered the opportunity to serve as a consultant with the International Development Bank ("IDB") in Washington, D.C. *Id.* at 34. Petitioner supported Respondent's pursuit of the opportunity. *Id.* at 42, 89. He agreed to structure his schedule in such a way that he would, for ten to twelve consecutive days, work in Paris and live in a small apartment in Paris that he had purchased before marriage. *Id.* at 42. For the remaining days of the month, he would live with his family in Washington, D.C. *Id.*

7. The court finds that the parties agreed to move their family to Washington, D.C., for at least 18 months—the term of Respondent's contract with IDB—but left open the possibility

---

[3] The parties disputed the actual dates they lived in Barcelona. *See* Trial Tr. at 113–14. Because neither party attempted to firmly establish these dates, the court makes no finding as to the actual periods the parties lived in Spain.

of staying for a longer period. According to Respondent, the initial contract that IDB offered her was for an 18-month term, which could be renewed only after a six-month period of separation. *Id.* at 175. Petitioner and Respondent preferred that Respondent receive a contract that allowed for successive renewal without a six-month separation period. *See id.* Such an arrangement afforded the family flexibility to stay for longer than 18 months in Washington, D.C., if desired. *See id.* Eventually, IDB offered Respondent a contract that would allow for successive renewals, which she accepted. *See id.* at 175. Respondent began an 18-month term with the IDB on July 1, 2018. *Id.* at 53.

8. The court does not credit Petitioner's insistence that he agreed to keep his family in Washington, D.C., for no more than 18 months. *See id.* at 46, 126–27. Petitioner did not dispute Respondent's testimony that she negotiated her contract to allow for the possibility of successive terms with IDB, so that the family potentially could live in Washington, D.C., for longer than 18 months. *See* Pet'r Ex. 14; Trial Tr. at 45–46.

9. Moreover, there is unrefuted evidence that Petitioner contemplated staying in Washington, D.C., for up to three years. The parties rented out their Barcelona property under a three-year lease. Trial Tr. at 116, 137; Resp. Ex. 7 (Respondent stating "[i]f we go to Washington we are not going to come back to Barcelona before 3 years anyway"). Respondent also expressed not wanting to live in the United States for "3 years" without proper U.S. identity papers. Resp. Ex. 23. Respondent also obtained G-4 diplomatic visas, which allowed the family to remain in the United States for up to five years, to which Respondent responded enthusiastically. Resp. Ex. 31. And, tellingly, when the parties began to have marital trouble, Respondent said that he could not continue to live as they were for "3 years" before their next move. Resp. Ex. 46.

10.    At the same time, the court does not credit Respondent's testimony that she and Petitioner agreed to leave Paris behind for good and intended to make Washington, D.C., their new home. *See* Trial Tr. at 347–48 (stating that "worst-case scenario was to stay three years" in Washington, D.C.); *see also* Pet'r Ex. 14 at 2 (stating in a discovery response in family court that the parties' shared intent was to remain in the United States for an indefinite period of time). The court so finds for a host of reasons.

11.    Both Petitioner and Respondent kept their jobs in Paris when they left for Washington, D.C. Petitioner remained a doctor with SOS Médecins. Although Petitioner initiated the process of obtaining a medical license in Respondent's home country of Uruguay, Trial Tr. at 107–08; Resp. Exs. 15, 16, 33, 34, 40, he never did the same in the United States.

12.    As for Respondent, she maintained her associate professorship at the Université d' Evry Va' d' Essonne. She requested a "détachement"—a French term meaning "temporary assignment" or "secondment"—from her university position for a period of 18 months. Pet'r Ex. 3 at 1; Resp. Ex. 5. She expressly asked to keep her affiliation with the university during this period, and she indicated she would continue to supervise her two doctoral students. Resp. Ex. 5. Also, during the period of the détachement, Respondent continued to accrue seniority, retirement, and pension credit with the Université d' Evry Va' d' Essonne. Pet'r Ex. 4 at 1. Respondent described herself as "nowadays on leave" from her teaching position at the Université d' Evry. Pet'r Ex. 6 at 1. Although Respondent testified that she kept her university affiliation to preserve her pension rights consistent with French law, Trial Tr. at 180, that fact only underscores the family's interest in keeping France, and not the United States, as their place of habitual residence.

13.    The parties' departure from Paris in the summer of 2018 did not resemble a permanent departure. The parties obtained a large storage unit in Paris, in the same building as

the family's home at 255 Rue Saint-Jacques.  Pet'r Ex. 8.  The family did not sell large personal belongings, such as household appliances and furniture.  Instead, they left such items in the storage unit in Paris.  *Id.*

14.     The couple's friends understood their move to Washington, D.C., was temporary. Respondent told family friend, Massimo Fedel, during a visit to Padua, Italy in spring 2018, that the position was a temporary 18-month position and that Petitioner would go back and forth between Paris and Washington, D.C., for that period.  Trial Tr. at 16–19.  Similarly, Geronimo Roussopoulos, who was Petitioner's best man and lives in Paris, testified that he had discussed the IDB position with Respondent during one of their social events together.  *Id.* at 142.  Respondent described her position to Mr. Roussopoulos as an 18-month contract with a bank in Washington, D.C.  *Id.*  The court credits Mr. Fedel's and Mr. Roussopoulos's testimony.

15.     Critically, Mr. Roussopoulos also testified that there was no going-away party, social event, or announcement that the family was leaving Paris indefinitely or permanently.  *Id.* at 143–44.  The court would have expected some social recognition of the parties' long-term departure from Paris had they intended to leave for good.

16.     The terms of the IDB contract offered no certainty that the family could remain in the United States beyond 18 months.  The contract term is from July 1, 2018, to December 31, 2019.  Pet'r Ex. 5 at 1.  The contract contemplates renewal, but expressly states that IDB "has no obligation to extend or renew this Agreement or to offer you a new one, even if your performance is outstanding, but it may do so if agreed to in writing at the time of the expiration of the appointment, and if compatible with the institution's regulation."  *Id.* at 4.  There is nothing in the contract—including the Annex that accompanied it, Pet'r Ex. 5—that would support a term of an automatic renewal.

*Arrival in Washington, D.C.*

17.     Before leaving for Washington, D.C., the parties discussed whether to buy a home in Washington, D.C.  Resp. Exs. 10, 11.  Once in Washington, D.C., they settled in the Woodley Park neighborhood and rented an apartment.  They hired a real estate agent to look for a property to buy in that neighborhood.  In October 2018, the parties made an offer on at least one home that was not accepted.  Trial Tr. at 60–61; Resp. Exs. 41, 42, 44.  Petitioner was actively involved in the parties' search for a property to purchase in Washington, D.C., including the type, location, price, financing, touring, and eventual selection of properties.  Trial Tr. at 191–97; Resp. Ex. 9 (emails from Petitioner identifying possible properties), 35–38 (texts concerning possible purchase of a home).

18.     The parties enrolled E.A.-H.S. at Oyster Adams, a Spanish bilingual elementary school, for the 2018-2019 school year.  Trial Tr. at 79, 186.  E.A.-H.S. is now comfortable speaking English, *id.* at 311, has made friends at school, *id.* at 290–91, 307–10, attends birthday parties and other social outings, and participates in various activities, like soccer.  *Id.*

19.     Respondent has made friends, as well, living in Washington, D.C.  Two were called as witnesses.   Daniela Felcman testified that she had not discussed the family moving from Washington, D.C., with either party.  *Id.* at 292, 295.  Sweta Shah similarly testified that neither party had discussed with her moving away from Washington, D.C.  *Id.* at 309–10.  Although the court credits these witnesses, their testimony carries little weight with respect to the disputed issues.  The general absence of a conversation with recently made friends about moving away from Washington, D.C., tells the court little about the parties' mutual understanding upon leaving Paris as to whether they would return.  Additionally, neither Ms. Felcman nor Ms. Shah testified to

having a specific conversation with either party as to their intention to remain long term in Washington, D.C.

20.     Respondent also called as witnesses her mother, Maria Cristina Vazquez Pedrouzo, and her step-father, Manuel Javier Paulino.  Ms. Vazquez Pedrouzo testified that she offered financial assistance to the parties to purchase a home in Washington, D.C.  *Id.* at 419.  Ms. Vazquez Pedrouzo was asked whether she had ever discussed leaving Washington, D.C., with Petitioner, and her response was that she understood that the family would live in Washington, D.C., and their daughter would go to school there, even possibly to university in the United States.  *Id.* at 420–22. Mr. Paulino testified with greater specificity.  He recalled speaking to Petitioner, who said that "his intention was for the family to reside in Washington."  *Id.* at 426–27.  Yet Mr. Paulino also testified that he and Petitioner did not discuss how long the family would remain in Washington, D.C., but did talk about the possibility of moving to Uruguay after the IDB contract expired, if Petitioner could get medically licensed there.  *Id.* at 427–28.  Ms. Pedrouzo's and Mr. Paulino's testimony confirms that when the parties moved to Washington, D.C., they did not intend to make it their permanent home.  They left open the possibility of remaining in Washington, D.C., for more than 18 months, but only contemplated living somewhere other than France long term— namely, Uruguay—if Petitioner could obtain a medical license there.  Again, Petitioner never took any steps to obtain a medical license in the United States.

### *Marital Discord*

21.     By December 2018, six months after their move to Washington, D.C., the parties' marriage began to show strain.  Resp. Exs. 46–52.

22.     In April 2019, unbeknownst to Petitioner, Respondent met with a family-law attorney.  Trial Tr. at 397–398.  She then filed on May 2, 2019, a Complaint for Custody in the

Superior Court of the District of Columbia (the "D.C. Superior Court"). Pet'r Ex. 9. The Complaint demanded primary physical custody of E.A.-H.S. "with reasonable rights of visitation to Defendant, *pendente lite* and permanently" and "joint legal custody, *pendente lite* and permanently" with Petitioner. *Id.* at 4.

23. On May 7, 2019, Respondent told Petitioner that she wished to separate, and then had Petitioner served with the D.C. Superior Court Complaint for Custody. Trial Tr. at 62–63. The court credits Petitioner's testimony that he was surprised by Respondent's filing of a complaint for custody of their daughter.

24. The parties met at a park near the apartment on May 10, 2019, to discuss the family's situation. *Id.* at 80–81. There, according to Petitioner, Respondent told him that she wished to remain in Washington, D.C., with their daughter and that the two of them would not be returning to France. *Id.* Although Respondent denies that this conversation took place, *id.* at 388–91, the court credits Petitioner's testimony on this point, as it is consistent with Respondent's demand for permanent primary physical custody of their child and her later decision to opt into a second 18-month contract with IDB. Also, on cross-examination, Respondent conceded that she has no plans to return the child to France in December 2019 absent a court order. *Id.* at 390–97.

25. On May 23, 2019, Petitioner answered and filed a counterclaim in response to Petitioner's Complaint for Custody. Pet'r Ex. 10. In his counterclaim, Petitioner demanded "joint physical and legal custody" of E.A.-H.S. *See id.* at 4. The D.C. Superior Court stayed the child-custody matter pending resolution of this case.

## IV. CONCLUSIONS OF LAW

A petitioner seeking the return of a child under the Convention must prove by a preponderance of the evidence that the child "has been wrongfully removed or retained within the

meaning of the Convention." 22 U.S.C. § 9003(e)(1)(A). "A removal or retention is 'wrongful' under the Convention when (1) 'it is in breach of rights of custody attributed to a person . . . under the law of the State in which the child was habitually resident immediately before the removal or retention; and' (2) 'at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.'" *Larbie v. Larbie*, 690 F.3d 295, 307 (5th Cir. 2012) (quoting Convention art. 3). Under the Convention, a petitioner must make a three-part showing to prevail. The petitioner must establish that (1) the child was "habitually resident" in the petitioner's country of residence when he or she was removed or retained; (2) the removal or retention breached the petitioner's custody rights under the law of the petitioner's home state; and (3) the petitioner was exercising his custody rights at the time of removal or retention. *See id.*; *see also Bader v. Kramer*, 484 F.3d 666, 668 (4th Cir. 2007); *Tsai-Yi Yang v. Fu-Chiang Tsui*, 499 F.3d 259, 270–71 (3d Cir. 2007); *Miller v. Miller*, 240 F.3d 392, 398 (4th Cir. 2001). If the petitioner satisfies his burden, the court must order return of the child, unless the respondent establishes an applicable affirmative defense. *See Bader*, 484 F.3d at 668; *Tsai-Yi Yang*, 499 F.3d at 271, n.11.

This case involves two disputed questions. First, did Respondent wrongfully retain E.A.-H.S and, if so, on what date did that retention occur? Second, what was E.A.-H.S.'s habitual residence on the date of purported wrongful retention? The parties do not dispute whether, if wrongfully retained, Petitioner's custody rights under French law would be violated. They would be. *See* Pet'r Ex. 1 (Aff. of French Law). Nor do they contest whether Petitioner was exercising his custody rights at the time of wrongful retention. He was. Finally, Respondent does not assert any affirmative defense under the Convention. The court's conclusions of law therefore focus on resolving the issues of wrongful retention and habitual residence.

## A.     Wrongful Retention

The court finds that Respondent wrongfully retained E.A.-H.S. on May 7, 2019, when she served upon Petitioner the Complaint for Custody that she filed in the D.C. Superior Court. Before that date, the parties enjoyed joint physical and legal custody of their child. Respondent's Complaint for Custody, however, sought to alter the status quo, by asking that she be awarded *permanent* primary physical custody of E.A.-H.S. Pet'r Ex. 9 at 4. She also advised Petitioner three days later that she would not be returning to Paris with their daughter. Trial Tr. 80–81. Respondent's initiation of a legal action for greater custody rights, plus her announcement that she would not return to Paris with E.A.-H.S., constitutes a wrongful retention under the Convention. *See Mozes v. Mozes*, 239 F.3d 1067, 1069–70, n.5 (9th Cir. 2001) (determining that wrongful retention occurred when the respondent asked a domestic court to grant custody of children).

The date of retention did not extend beyond May 23, 2019, the date on which Petitioner answered and filed a counterclaim in response to Respondent's Complaint for Custody. Pet'r Ex. 10. The Third Circuit has defined the "retention date" as "the date beyond which the noncustodial parent no longer consents to the child's continued habitation with the custodial parent and instead seeks to reassert custody rights, as clearly and unequivocally communicated through words, actions, or some combination thereof." *Blackledge v. Blackledge*, 866 F.3d 169, 179 (3d Cir. 2017); *see also Marks on behalf of SM, AM, and BM v. Hochhauser*, 876 F.3d 416, 422 (2d Cir. 2017) (identifying date of wrongful retention as that "on which the child ought to have been returned to its custodians or on which the holder of the right of custody refused to agree to an extension of the child's stay in a place other than that of its habitual residence" (internal quotation marks and citation omitted)). Here, Petitioner's counterclaim sought to maintain joint physical and legal custody of E.A.-H.S. This counterclaim was a clear assertion of his custody rights and

signaled that he did not consent to allowing his daughter's "continued habitation with the custodial parent." May 23, 2019, therefore is the latest date of wrongful retention.

For her part, Respondent contends that Petitioner's claim arises under the rubric of an "anticipatory retention," which, according to Respondent, federal courts have not recognized. *See* Resp. Proposed Findings of Fact and Conclusions of Law, ECF No. 34, ¶¶ 68–78. She asserts that the court cannot fix a wrongful retention date, because "the wrongful retention has not taken place yet, and may not ever take place, especially given the ongoing custody and visitation proceedings in the District of Columbia." *Id.* ¶ 74. The Petition is "anticipatory" in the sense that the date until which the parties agreed to remain in Washington, D.C., has yet to arrive—at the earliest, December 31, 2019, the date Respondent's first contract ends with IDB. Thus, she maintains, the petition is not ripe for consideration. *See id.* ¶ 68.

The court disagrees. One of the primary cases upon which Respondent relies—the Ninth Circuit's decision in *Mozes*—is to the contrary. *See id.* ¶ 73; Draft Hr'g Tr., Aug. 12, 2019, at 51. *Mozes* is arguably the leading circuit court decision regarding the issue of habitual residence under the Convention. *See Maxwell v. Maxwell*, 588 F.3d 245, 251 (4th Cir. 2009) (describing *Mozes* as "serv[ing] as a guide for federal courts in determining parental intentions in Hague Convention cases"). *Mozes* is clearly an "anticipatory retention" case. Much like here, in *Mozes*, the mother and father had agreed that the children would remain in the United States for a time certain—there, fifteen months—"though they disagree[d] as to what understanding existed beyond that." *See* 239 F.3d at 1069. However, after a year in the United States, the mother sought dissolution of the marriage and custody of the children in California state court. *See id.* The Ninth Circuit had no difficulty identifying the date of wrongful detention as "the moment . . . when [the mother] asked the Los Angeles County Superior Court to grant her custody of [the children]." *Id.* at 1070. So,

too, here.  Respondent sought to alter the parties' status quo as it relates to custody of their daughter when she sought primary physical custody in D.C. Superior Court.  That is the earliest date of wrongful retention.  The court is not aware of any case that requires a petitioner to wait to sue for custody until the date on which the parties agreed to allow their child to remain in the United States passes, when the custodial parent seeks to assert dominant custody rights, physical or legal, over the child.  Tellingly, other circuit courts have found acts of wrongful retention to precede the agreed-upon date for a child to remain in the United States.  *See e.g.*, *Blackledge*, 866 F.3d at 179 (rejecting "the notion that the original agreement for a longer period vitiated the noncustodial parent's ability to clearly communicate her desire to regain custody of the child" and recognizing that a parent may "accelerate a retention date by" withdrawing consent to have the child remain with the custodial parent); *Marks on behalf of SM v. Hochauser*, 876 F.3d 416, 417 (2d Cir. 2017) (holding that mother's email declaring she would not return to Thailand three days before planned return was wrongful retention date); *Darin v. Olivero-Huffman*, 746 F.3d 1, 10–11 (1st Cir. 2014) (finding wrongful retention occurred when respondent "made clear" to petitioner that child would permanently reside in United States).

Equally persuasive authority can be found across the Atlantic in the decision of the Supreme Court of the United Kingdom in *In the matter of C (Children)* [2018] U.K.S.C. 8 (appeal taken from EWCA Civ).  Our own Supreme Court has instructed that when interpreting international conventions and treaties "the opinions of our sister signatories [are] entitled to considerable weight."  *Air France v. Saks*, 470 U.S. 392, 404, (1985) (citation omitted).  In addition, Congress has recognized "the need for uniform international interpretation of the Convention."  22 U.S.C. § (b)(3)(B); *see also Abbott,* 560 U.S. at 16 (observing that the principle of giving "considerable weight" to the opinions of "sister signatories" "applies with special force

here, for Congress has directed that uniform interpretation of the Convention is part of the Convention's framework"). In *In re Matter of Children*, the U.K. Supreme Court thoroughly analyzed how courts in various countries have treated the question of anticipatory repudiation and held that "repudiatory retention is possible in law." *In re Matter of Children* ¶ 50. "The objections" to anticipatory repudiation, the court summarized, "are insubstantial whereas the arguments against requiring the left-behind parent to do nothing when it is clear that the child will not be returned are convincing and conform to the scheme of the Abduction Convention." *Id.*

The only case on which Respondent relies to support her position, the First Circuit's decision in *Toren v. Toren*, is distinguishable. In *Toren*, the parents, already divorced, had agreed to allow the children to remain in the United States until July 21, 2000. *See* 191 F.3d 23, 25 (1st Cir. 1999). In 1997, just prior to the father's scheduled visit to the United States, the mother filed a verified complaint in state court asking to modify the terms of visitation. *See id.* at 26. The state court agreed to do so and granted the mother additional custody rights. *See id.* The First Circuit found that the mother had not wrongfully retained the children, because her complaint only sought modification of the parents' visitation agreement and did not manifest an intent not to return the children after the agreed-upon date of July 21, 2000. *See id.* at 28. Here, by contrast, Respondent did not merely ask for a change in visitation but sought primary custody of the minor child—a change in the status quo that, if granted, would have allowed Respondent to establish Washington, D.C., as the child's habitual residence. Moreover, the court credits Petitioner's testimony that Respondent expressed her intention not to return to France. Respondent notably renewed her IDB contract for another 18 months after filing for primary physical custody and apparently did so without consulting Petitioner. These acts are not consistent with an intent to return to France. This case therefore is different than *Toren*.

### B. Habitual Residence

The court turns next to deciding E.A.-H.S.'s "habitual residence" as of the date of unlawful retention. Habitual residence, or "the place where [the child] customarily lives," *Taglieri v. Monasky*, 907 F.3d 404, 407 (6th Cir. 2018), is "the central—often outcome-determinative—concept on which the [Convention] is founded." *Mozes*, 239 F.3d at 1072. The Convention, however, does not define the term, *see Gitter v. Gitter*, 396 F.3d 124, 131 (2d Cir. 2005); nor has the D.C. Circuit addressed what constitutes a child's "habitual residence" under the Convention. But other circuits have done so extensively. Following the Ninth Circuit's decision in *Mozes*, the majority of circuit courts define habitual residence in terms of "shared parental intent," and secondarily consider whether the child has become "acclimatized." *Blackledge*, 866 F.3d at 180; *see also Mozes*, 239 F.3d at 1074–75; *Taglieri*, 907 F.3d at 407 (noting that "[e]very circuit to consider the question [of habitual residence] looks to both standards"). The Sixth Circuit is the only circuit that gives greater priority to acclimatization, but it does so only in cases involving older children. *See Taglieri*, 907 F.3d at 407–08 (describing the acclimatization inquiry as "the primary approach" and the "shared parental intent" inquiry as a "secondary" and "alternative" approach used when young children are "incapable of acclimating"); *see also Koch v. Koch*, 450 F.3d 703, 713 (7th Cir. 2006) ("In the case of young children, the court found it most prudent to focus on the intent of the parents rather than the intent of the child in determining the child's habitual residence.").

## 1. Shared Parental Intent

The question of shared parental intent focuses on the parents' "settled purpose" as to a child's place of residence. *Mozes*, 239 F.3d at 1074. The inquiry is necessarily fact intensive, and trial courts are advised to look beyond the parents' testimony and to consider the record as a whole. *See Maxwell v. Maxwell,* 588 F.3d 245, 252 (4th Cir. 2009) ("In cases where there is a dispute regarding a child's habitual residence, 'the representations of the parties cannot be accepted at face value, and courts must determine [habitual residence] from all available evidence.'" (quoting *Gitter,* 396 F.3d at 135)). In the end, "[h]abitual residence is intended to be a description of a factual state of affairs . . . ." *Mozes*, 239 F.3d at 1081.

The parties agree that, in determining habitual residence, the court must first ask whether the parents "form[ed] a settled intention to abandon the one left behind." *Id.* at 1075; *see also* Resp.'s Proposed Findings ¶ 80 (citing *Mozes*, 239 F.3d at 1075). "[T]he agreement between the parents and the circumstances surrounding it must enable the court to infer a shared intent to abandon the previous habitual residence." *Mozes*, 239 F.3d at 1081. That said, "[t]he mere fact that the parents have consented for the child to move to a new country does not prove that they share the necessary intent to make that new location the child's habitual residence." *Berezowsky v. Ojeda*, 765 F.3d 456, 467 (5th Cir. 2014). Indeed, courts have cautioned that, "in the absence of settled parental intent, courts should be slow to infer from [the child's contact in the new country] that an earlier habitual residence has been abandoned." *Mozes*, 239 F.3d at 1079. That is especially true when the child's move is intended to be for a "specific, limited duration." *Blackledge*, 866 F.3d at 180–81 (describing a "presumption" against recognizing a change in habitual residence when the child's move is for a "specific, limited duration"). In such cases,

"court have generally refused to find that the changed intentions of one parent led to an alteration in the child's habitual residence." *Mozes*, 239 F.3d at 1077.

In light of these principles, the question the court faces here is whether, as of May 2019, the parties' shared settled intent was to abandon France as E.A.-H.S.'s habitual residence in favor of the United States. The answer to that question is no. There is no real dispute that the child's habitual residence was France before the family relocated to the United States in the summer of 2018 for Respondent's détachement with IDB. The parties married in France, E.A.-H.S. was born in France, the family lived primarily in an apartment in Paris, the child attended nursery school there, and the parents and child had strong social ties in that country. The parties' respective jobs were in Paris, with Petitioner licensed to practice medicine only in France and Respondent a university professor accruing a pension under French law. To be sure, the family did spend extended time in Barcelona, but Spain was clearly their secondary home, used primarily when Respondent secured a visiting professorship or in the summer months.

When the family left Paris, the parties' clear intent was to remain in Washington, D.C., for at least 18 months, consistent with Respondent's contract term with IDB. Beyond that "specific, limited" time period, however, the parties' plans were aspirational and contingent. The parties were prepared to extend their stay for an additional 18 months, but as of May 2019, the date of E.A.-H.S.'s wrongful retention, that prospect remained uncertain. Renewal of Respondent's contract rested entirely within the discretion of IDB, and Respondent presented no evidence that IDB had renewed her contract before May 7, 2019, or that Petitioner had agreed to her seeking a new 18-month contract by that date. The absence of such evidence is important. Given the marital strife that manifested in December 2018, which appears due, at least in part, to the parties living on different continents for weeks at a time, the court cannot find that whatever enthusiasm they

shared about remaining in Washington, D.C., for more than 18 months persisted after their marriage began to deteriorate.

What is clear, based on the full record, is that the parties did not leave France in a manner that supports a shared intent to relocate indefinitely to the United States. Ample evidence supports this conclusion. First, Petitioner remained in France to work and took no steps to obtain a medical license or employment in the United States. He did make efforts to qualify for medical practice in Uruguay but took no comparable steps in the United States. Second, Respondent did not dissociate herself from her university position, instead she took leave akin to a sabbatical. Though Respondent explained that she maintained her university position to continue her pension eligibility, that action only reinforces the parties' intent to return to France. Third, the parties did not dispose of valuable personal property, such as furniture and appliances. Instead, they rented a storage unit in the same building as their former shared home in Paris. *See Berezowsky v. Ojeda*, 765 F.3d 456, 472 (5th Cir. 2014) ("Selling the family's home or cars, for example, may indicate the intention to make a more permanent move."); *see also Larbie*, 690 F.3d at 299 (citing as evidence of non-abandonment of habitual residence in the United States that the mother left substantially all of her belongings in United States when flying to England); *cf. Maxwell*, 588 F.3d at 248 (mother brought a number of household items from the United States to Australia, including bedding, dishes, kitchen supplies, and summer clothing); *Koch*, 450 F.3d at 714 (family took all possessions except a few large items from the United States to Germany). Finally, the parties did not communicate an intention to leave permanently to family and friends. The absence of a going-away party or a similar acknowledgement of permanent departure is telling.[4]

---

[4] Respondent emphasizes the parties' efforts to buy property in Washington, D.C., as proof of their intent to make the United States their habitual residence. The record evidence is not so clear, however. The parties discussed purchasing a home as more economical than renting. Also, as demonstrated by their ownership of the apartment in Barcelona, the parties also view buying property as an investment.

The court recognizes that habitual residence can change even when the minor child is moved only for a definite period of time with the intent to return to the original country. *See, e.g.*, *Blackledge*, 866 F.3d at 182–83; *Mozes*, 239 F.3d at 1077. However, the cases that have found a settled intent to change habitual residence when the child's move was for a "specific, limited" duration are distinguishable. Such cases typically have involved the non-custodial parent withdrawing consent for the child to remain in the new country before the end of the agreed-upon time to do so, and the child having significant familial and other ties in the new country. *See, e.g.*, *Whiting v. Krassner*, 391 F.3d 540, 542 (3d Cir. 2004) (holding that Canada, not the United States, was the habitual residence where the parents had agreed that the child would spend two years in Canada and the mother and young child had familial ties in Canada, even though U.S.-based non-custodial parent withdrew his consent after two months); *Blackledge*, 866 F.3d at 184 (finding the minor child to be habitually resident in the United States because "by the time of the retention date, [the United States] was the longest and most stable residence he had known in his fairly nomadic early years," and the child also had extended family in the United States and was a United States citizen); *Koch*, 450 F.3d at 716–17 (finding change in habitual residence where the couple moved with the "hope" of returning to the United States, but otherwise expected to remain in Germany for an extended period and one parent was a German citizen). No similar circumstances exist here. Neither parent had a prior connection to the United States. The family entered the United States on temporary visas so Respondent could work on a contract of finite duration. And, importantly, the custodial parent in this case sought to alter the status quo. Thus, this is not a case like *Whiting* where the non-custodial parent unilaterally withdrew his consent to the child living in a different country before the agreed-upon time to live elsewhere expired.

This case instead closely resembles the facts of *Mozes*. There, the children, Israeli residents, traveled with their mother to the United States for a fifteen-month visit to "partake of American culture," *Mozes*, 239 F.3d at 1069, which the court analogized to a "study[ ] abroad" program, *id.* at 1083. A year into that visit, however, the mother filed for divorce and retained the children in the United States. *Id.* at 1069. In rejecting the mother's argument that the United States had become the children's then-habitual residence, the Ninth Circuit concluded that, when the children moved to the United States, the "normal expectation," shared by both the parents and the children, was that the family would reunite and Israel would remain their habitual residence. *Id.* at 1083. The court explained that the parents and the children were Israeli citizens; they had lived all their lives in Israel and entered the United States on a temporary visa; and neither parent had a prior connection to the United States. *Id.* at 1069, 1082. Similar facts are present in this case. Although Respondent attempts to cast the parties' agreement as one to reside here "indefinitely," in truth, they agreed to a finite stay in the United States of 18 months, and possibly more, if IDB renewed Respondent's contract. In no event, however, did they agree that E.A.-H.S. would live here permanently. Like the parents in *Mozes*, the parties in this case did not intend to change their daughter's habitual residence by coming to the United States. *See also Sundberg v. Bailey*, 765 Fed. Appx. 910, 912 (4th Cir. 2019) (finding that parents did not have shared intent to make the United States the child's habitual residence instead of Sweden where the parents only agreed to bring the child to the United States for several months).

2.      *Acclimatization*

Having determined the parties' habitual residence to be France as of May 7, 2019, the court briefly discusses acclimatization. The court gives this factor less weight. *See Mozes*, 239 F.3d at 1079. The parties here did as any responsible parent would do: they took steps to create a normal

life for E.A.-H.S. in Washington, D.C.  They enrolled her in school, and E.A.-H.S. made friends and participated in extra-curricular activities.  But E.A.-H.S., age four, had lived in the United States for only about ten months when Respondent filed a custody action that sought to alter the status quo.  Evidence of acclimatization over such a short period of time for such a young child is not enough to overcome the parties' lack of intent to abandon France as their daughter's habitual residence.  *See Papakosmas v. Papakosmas*, 483 F.3d 617, 626 (9th Cir. 2007) (noting that "in the absence of settled parental intent, courts should be slow to infer from such contacts [in the new country] that an earlier habitual residence has been abandoned" (internal citation and quotation marks omitted)); *Sundberg*, 765 Fed. Appx. at 914 (finding that "[a]ttending school for one school year does little to show that the child's life has sufficiently 'developed' in her new surroundings to make it her home").

## V.  CONCLUSION

For the reasons stated in these Findings of Fact and Conclusions of Law, and in the court's Order, issued on Aug. 21, 2019, ECF No. 38, the court grants the Petition for E.A.-S.H.'s return to France.  The court will issue a separate, final order that contains the child's return date.

Dated:  October 9, 2019

Amit P. Mehta
United States District Court Judge